**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **TRAVIS D. MOODY,** | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | CASE NO. 07-CV-135-FHM |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| DEFENDANT. | ) | |

## OPINION AND ORDER

Plaintiff, Travis D. Moody, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1]  In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1]  Plaintiff's April 9, 2004 (protective filing date 2/26/04) application for Supplemental Security Income benefits was denied initially and upon reconsideration.  A hearing before an Administrative Law Judge (ALJ) was held April 24, 2006.  By decision dated August 18, 2006, the ALJ entered the findings which are the subject of this appeal.  The Appeals Council denied review of the findings of the ALJ on January 12, 2007.  The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003).  The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 23 years old at the time of the hearing. [R. 1166].  He claims to have been disabled since February 1, 2003, due to diabetes mellitus, type 1 with peripheral neuropathy, gastroparesis and retinopathy; groin pain; low back pain and major depression and anxiety.  The ALJ determined that Plaintiff has severe impairments consisting of lumbosacral strain; diabetes mellitus, type 1 with neuropathy; and gastroparesis. [R.21].  Despite these impairments, the ALJ found that Plaintiff retains the residual functional capacity (RFC) to perform the full range of sedentary work. [R.22, 25].  He determined that Plaintiff has no past relevant work (PRW). [R. 24]. Based upon the Medical-Vocational Guidelines (Grids) and the testimony of a Vocational Expert (VE), the ALJ concluded there are jobs in the national economy that Plaintiff can perform and that Plaintiff is, therefore, not disabled as defined by the Social Security Act. [R. 24-25].  The case was thus decided at step five of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts the ALJ erred: 1) at step two by not properly considering all Plaintiff's severe impairments; 2) at step three because he did not consider the relevant criteria for Listing 9.08 and made improper determinations for the paragraph "B"

2

findings concerning his mental impairments; 3) by failing to properly consider the opinions of the treating physicians; 4) by failing to perform a proper credibility determination; and 5) by failing to propound a proper hypothetical to the VE.  [Plaintiff's Opening Brief, [Dkt. 16, p. 1-2].

After review of the voluminous medical record, which spans slightly more than three years and includes documented treatment in hospital emergency rooms and/or as a hospital inpatient 81 times during that period, the Court finds the ALJ's decision is deficient in several respects.  First among those deficiencies is the ALJ's failure to acknowledge or discuss Plaintiff's extensive medical contacts or to explain how he concluded that a person who requires such frequent and serious medical intervention can perform substantial gainful work activity on a continuing basis.  In addition, the ALJ failed to properly consider the selected medical evidence that he did address in his written decision.  The ALJ also applied an incorrect legal standard in evaluating Plaintiff's credibility and failed to link his findings to the evidence.  For those reasons, the Court finds this case must be reversed and remanded to the Commissioner for reconsideration.

## Medical History

Because the extent, frequency and nature of Plaintiff's medical treatment is central to the Court's resolution of this case, and in light of the ALJ's failure to adequately address the medical evidence in his decision, the Court has set forth a more detailed chronology of the medical record than is usually required.

Plaintiff was diagnosed with Diabetes Mellitus, Type 1 (DM1), at the age of six.[2] The medical evidence in this administrative record commences on March 5, 2003, with Plaintiff's visit to St. John's Hospital Emergency Room in Sapulpa, Oklahoma (St. John Sapulpa) for a right knee injury  and uncontrolled diabetes mellitus. [R. 351-356].  He was seen there again on March 11, 2003, for followup care. [R. 346-350].  He was treated once in April 2003 for uncontrolled diabetes and musculoskeletal chest pain. [R. 340-345].

In August 2003, Plaintiff was treated five times for uncontrolled diabetes:  He was seen twice (4 days apart) at the Tulsa Regional Medical Center (TRMC) for dehydration, weakness, excessive urination and increased weight loss. [R. 441 - 454]. He was seen two days later at Oklahoma State University Health Care Center (OSU) for continuing lightheadness, weakness, nausea, vomiting, blurred vision and severe pain in his upper legs. [R. 485].  There, he was diagnosed with DM1, depression, hyperglycemia and peripheral neuropathy[3] and was transferred to TRMC for inpatient treatment. *Id.*  He was hospitalized for three days at TRMC until control of diabetes and

---

[2]  Diabetes Mellitus, Type 1, often called juvenile or insulin-dependent diabetes, is a chronic (lifelong) disease that occurs when the pancreas does not produce enough insulin to properly control blood sugar levels.  In this type of diabetes, cells of the pancreas produce little or no insulin, the hormone that allows glucose to enter body cells.  Symptoms include increased thirst, increased urination, weight loss despite increased appetite, nausea, vomiting, abdominal pain and fatigue. See medical definitions online at: http://www.nlm.nih.gov/medlineplus/ency/article/000305.htm

[3]  The peripheral nerves relay information from the central nervous system to muscles and other organs and from skin, joints and other organs back to the brain.  Peripheral neuropathy occurs when these nerves fail to function properly, resulting in pain, loss of sensation or inability to control muscles. See medical encyclopedia online at: http://www.nlm.nih.gov/medlineplus/ency/article/000593.htm

4

gastroparesis[4] improved.  [R. 185-189].   Medical noncompliance with diabetes medications due to financial resource issues was noted. *Id.*  Three days later he was readmitted for elevated blood sugar due to noncompliance with his diet but he was discharged AMA (against medical advice) after he went off the floor to smoke. [R. 174]. On August 29, 2003, he appeared for his followup examination at OSU asking for referral to smoking cessation therapy. [R. 484].  His diabetes was still uncontrolled but noted to be improving on new medication levels, although he still had blurry vision and leg pain due to peripheral neuropathy. *Id.*  He was instructed to talk to Neighbor-4-Neighbor regarding an ophthalmologist appointment.  *Id.*

In September 2003, Plaintiff was treated six times for diabetes related symptoms: Plaintiff was seen at TRMC on September 2, 2003, with elevated blood sugar and blurry vision. [R. 439-440].  He was seen two days later and then again six days after that at St. John Sapulpa for bilateral leg pain, low back pain, high blood sugar, diabetes under poor control, diabetic neuropathy and recurrent vomiting. [R. 328-339].  He was given a "GI Cocktail,"[5] Reglan[6] by IV and Lortab.[7]   Nine days later he returned to TRMC with

---

[4]  Gastroparesis, also called delayed gastric emptying, is a disorder in which the stomach takes too long to empty its contents.  Normally, the stomach contracts to move food down into the small intestine for digestion.  The vagus nerve controls the movement of food from the stomach through the digestive tract.  Gastroparesis occurs when the vagus nerve is damaged and the muscles of the stomach and intestines do not work normally.  Food then moves slowly or stops moving through the digestive tract.  The most common cause of gastroparesis is diabetes.  See medical encyclopedia online at: http://digestive.niddk.nih.gov/ddiseases/pubs/gastroparesis.

[5]  "GI Cocktail" is a mixture of liquid antacid, viscous lidocaine, and an anticholinergic. See medical information online at www.pubmed.gov, http://www.ncbi.nlm.nih.gov/pubmed

[6]  Reglan is indicated for the relief of symptoms associated with acute and recurrent diabetic gastric stasis. PDR 53rd ed. 2643.

[7]  Lortab (hydrocodone bitartrate and acetaminophen) is a semisynthetic narcotic analgesic and antititussive indicated for relief of moderate to moderately severe pain. *Physicians' Desk Reference* (continued...)

complaints of chest pain and was diagnosed with bronchitis. [R. 431-438].  Six days

after that he went to St. John Sapulpa for lower quadrant pain and right groin pain. [R.

323-327].  He was advised to apply moist heat and to see Dr. Glendening for further

pain management. *Id.*  The next day he sought treatment at TRMC for worsening groin

pain and was given Toradol[8] and Norflex.[9] [R. 428-430].

Plaintiff was treated eight times during October 2003 for diabetes related

complications:  On October 3, 2003, Plaintiff went to OSU for followup of his groin and

leg pain. [R. 483].  He was diagnosed with DM1, peripheral neuropathy and chronic

pain, was given Toradol, told to followup in one month and was to be referred to pain

management. *Id.*  He went to St. John Sapulpa four days later complaining of bilateral

leg pain and requesting refill of his pain medications. [R. 319-322].  He refused IV

insulin and left the hospital against medical advice. *Id.*  The next day he went to OSU,

complaining of vomiting, fever for two days and leg and back pain. [R. 482].  Thoracic

muscle spasm was recorded and Plaintiff was given Flexeril[10] and Neurontin[11] as well

as insulin medications. *Id.*  One week later, Plaintiff was back at TRMC complaining of

---

[7]  (...continued)
(PDR) 53rd ed. 3162.

[8]  Toradol is a nonsteroidal anti-inflammatory indicated for the short term (up to 5 days) management of moderately severe acute pain that requires analgesia at the opioid level. PDR 53rd ed. 2716.

[9]  Norflex is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomfort associated with acute painful musculoskeletal conditions. PDR 53rd ed. 1662

[10]  Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. PDR 53rd ed. 1793-1794.

[11]  Neurontin is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy. PDR 53rd ed. 2301-2302.

increased back and leg pain and a rash on his lower back. [R. 154-167].  He was hospitalized for two days, placed initially on Morphine[12] and Lortab, then switched to Percocet[13] and sent home on Percocet for pain control.  He was also started on Wellbutrin[14] to help him quit smoking.  *Id.*  Altace[15]  was added because he was exhibiting signs of hypertension.  He was instructed at discharge to followup at OSU on October 21, 2003, and to follow his diabetic diet. *Id.*  At that appointment, C. Mertz, D.O. recorded continuing low back pain and sleep and appetite disturbance. [R. 480-481].  Plaintiff told Dr. Mertz he was taking two Percocets for pain but that Lortab "helps best." [R. 480].  Dr. Mertz stated that Plaintiff displayed classic symptoms of opioid withdrawal. He prescribed Methadone[16] and considered referring Plaintiff to "detox" but wrote: "however, in reviewing his chart, he has had uncontrolled pain in [both lateral extremities] and back for months.  Because of this, a pain specialist is a more appropriate referral." [R. 480].  In handwritten notes later in October 2003, two separate doctors at OSU expressed concern that Plaintiff was becoming addicted to narcotics and recommended Plaintiff go to detox. [R. 479].  On October 30, 2003, the two

---

[12]  Morphine is a highly potent opiate analgesic indicated for relief of moderate to severe pain. PDR 53rd ed. 2559.

[13]  Percocet (oxycodone and acetaminophen) is indicated for the relief of moderate to moderately severe pain. PDR 53rd ed. 984.

[14]  Wellbutrin is an antidepressant. PDR 53rd ed. 1252.

[15]  Altace is an angiotensin-converting enzyme (ACE) inhibitor indicated for treatment of hypertension (high blood pressure).

[16]  Methadone is a synthetic narcotic analgesic with multiple actions quantitatively similar to those of morphine and is used for detoxification treatment of narcotic addiction and for maintenance treatment of narcotic addiction in conjunction with appropriate social and medical services. PDR 53rd ed. 2754.

physicians repeated their concern about "a vicious cycle" of treating both Plaintiff's neuropathic pain and depression with narcotics. [R. 476-477].  Plaintiff's Neurontin was increased and Lexapro[17] was added.  Plaintiff and his mother were advised that Plaintiff would not receive any more narcotics at that facility and that at 20 years of age, they believed pursuing disability was not a good route for him. [R. 477].

Plaintiff was treated on nine separate occasions at five different facilities during November 2003:  He was seen four times at St. John Sapulpa for back, flank, groin and leg pain. [R. 313-318, 307-311, 302-306, 296-301].  Each time he was diagnosed with DM1 under poor control with diabetic peripheral neuropathy and each time he was given Lortab or IV Morphine.  On one of those occasions he was transferred to St. Francis Hospital for inpatient treatment. Another time he was transferred to TRMC. [R. 217-223, 296-301].  He was seen twice at OSU where he received Morphine and Lortab along with insulin medications. [R. 474-475].  He went once to SouthCrest Hospital (SouthCrest) Emergency Room where his severe vomiting and leg pain were relieved with IV medication. [R. 107-118].  The next day he sought treatment at TRMC for the same symptoms. [R. 427].  On November 28, 2003, he was admitted for 24 hour observation at TRMC. [R. 146-149].  He was assessed to be hyperglycemic and dehydrated and was treated with IV insulin and fluids. [R. 146-149].  Neurontin was noted to be the prior treatment for chronic neuropathic pain, but improvement with Lortab was recorded and, when discharged, Plaintiff was prescribed Lortab and told to reschedule an appointment with a pain management specialist. [R. 795-797].

---

[17]  Lexapro (Escitalopram) is used to treat depression and generalized anxiety disorder. See drug information online at: http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html

In December 2003, Plaintiff was treated on five occasions at four different facilities:  On December 2, 2003, Plaintiff was admitted to TRMC for treatment of diabetic ketoacidosis.[18] [R. 142-143, 134-141]. He was hospitalized for three days, receiving greater than 4 liters of fluid bolused with IV insulin. [R. 129].  Because of Plaintiff's continued complaints of pain in the lower extremities, an EMG was conducted which demonstrated peripheral neuropathy consistent with diabetic disease. *Id.*  Plaintiff was "aggressively educated on diabetic nutrition and diabetic education."  Upon discharge, an appointment was made for him at the OSU clinic with Bruce Baugher, D.O. and Lexapro and Neurontin were continued. [R. 129].  On December 10, 2003, Plaintiff was examined by Dr. Baugher. [R. 472].  Continuing nausea, pain and sleep disturbance were noted and the physical examination revealed mild neurological sensory deficits in both lower extremities.  Dr. Baugher's impressions were insulin dependent diabetes mellitus, type 1, peripheral neuropathy, tobacco abuse and uncontrolled blood pressure.  His plan was for an ophthalmology referral, to absolutely stop smoking, prescription of Lortab, a long discussion about compliance and a return examination in one month. *Id.*  Plaintiff reported to St. John Sapulpa four days later that he had testicular pain, painful urination, vomiting, abdominal pain, chest pain, dehydration, pain in his legs, feet, hands and arms. [R. 288-295].  He was given

---

[18] Diabetic ketoacidosis is a complication of diabetes.  It is caused by the buildup of by-products of fat breakdown, called ketones.  This occurs when glucose is not available as a fuel source for the body and fat is used instead. When fat is metabolized, ketones build up in the blood and "spill" over into the urine.  Acidosis develops when the blood becomes more acidic than body tissues. See medical encyclopedia online at: http://www.nlm.nih.gov/medlineplus/ency/article/000320.htm

Methadone and Phenergan.[19]  *Id.*   He returned to TRMC one week after that complaining of groin, back and bilateral leg pain. [R. 414-419].  He advised he had been seen a week prior in Sapulpa for the same symptoms, that he had been given Methadone but had since run out. [R. 415].  He was given IV insulin and Demerol[20] and discharged with a prescription for Lortab. [R. 415].   Two days later, Plaintiff was admitted to St. John Medical Center in Tulsa (St. John Tulsa) for scrotal pain and low back pain. [R. 251-260].  His urinalysis showed elevated blood glucose levels with 2+ ketones. [R. 252].  A scrotal ultrasound was normal; as was a CT scan of the abdomen. [R. 253].  Plaintiff's previous treatment records from TRMC were ordered "for further insight into his neuropathy and pain syndrome." *Id.*  He was discharged with the diagnosis of chronic pain syndrome, was advised to followup with Dr. [Baugher] or at the OU Internal Medical Clinic within three weeks, was given a prescription for Methadone and was asked to continue his insulin home regimen. *Id.*

In January 2004, Plaintiff was seen at OSU for three followup appointments. [R. 469-471].  During his January 9, 2004 appointment, Plaintiff was examined at the OSU Ophthalmology Clinic where diabetic retinopathy[21] was diagnosed. [R. 469-470].

On February 19, 2004, Plaintiff saw Dr. Baugher at OSU who noted that Plaintiff had missed his last ophthalmology appointment and that he was "scheduled for laser

---

[19]  Phenergan is indicated for control of nausea and vomiting. PDR 53rd ed. 3356.

[20]  Demerol is a narcotic analgesic indicated for the relief of moderate to severe pain. PDR 53rd ed. 2780.

[21]  Diabetic retinopathy is caused by damage to blood vessels of the retina, the light-sensitive outer layer of the eye. See medical encyclopedia online at: http://www.nlm.nih.gov/medlineplus/ency/article/001212.htm

tx." [R. 467].   Plaintiff was urged to keep his ophthalmology appointment and to decrease his Methadone.  His prescription for Lortab was refilled. *Id.* On that date, Dr. Baugher filled out and signed a Medical Questionnaire, apparently sent to him on behalf of Plaintiff by a non-profit organization for low-income clients. [R. 119].  Dr. Baugher diagnosed: DM1; Peripheral Neuropathy;  Retinopathy. [R. 120].  His prognosis was as follows:

> DMI is a progressive illness and he will have progression of his neuropathy and retinopathy especially if his blood sugars continue to be poorly controlled.

[R. 120].  He stated Plaintiff had been under his care since November 3 and to the question: "Is your patient suffering from a severe impairment or impairments which have lasted or is expected to last for a period of one year and will prevent substantial gainful work activity?" he answered "Yes."  He wrote:  "Mr. Moody has significant complications from his diabetes secondary to a history of poor control.  He is making efforts to improve control." [R. 120].  Five days later, Plaintiff went to TRMC, complaining of chest, leg and back pain. [R. 405-413].  He advised he had recently stopped taking Methadone and that he was "unable to stand on legs." [R. 406-407].   He was administered insulin by IV. [R. 406].  Two days later, on February 26, 2004, Plaintiff reported to OSU that the Lortab was not working for pain and that he was depressed "not getting out of house." [R. 466].  His diabetes was noted to be under very poor control.  He had peripheral neuropathy and retinopathy.  Neurontin was ordered and his Phenergan was refilled. *Id.*  On February 28, 2004, Plaintiff was treated at TRMC for a syncopal (fainting) episode and shoulder pain. [R. 396-404].  He was treated with insulin and Reglan by IV and discharged with a shoulder sling. *Id.*  The next day he was

11

admitted to TRMC from the emergency room for near syncopal episodes secondary to hyperglycemia. [R. 121-127, 455-458]. He was diagnosed with DM1, poorly controlled; History of noncompliance; Peripheral Neuropathy; Diabetic retinopathy and Diabetic gastroparesis. *Id.* He was discharged two days later in stable condition and advised to keep an appointment with Dr. Baugher on March 19, 2004. [R. 123].

During the first week of March 2004, Plaintiff was seen every day at a local hospital emergency room: St. John Tulsa [R. 245-250, 232-244, 225-231]; TRMC [R. 392-395, 384-391, 377-383]; St. Francis [R. 198-207]. His complaints ranged from testicle pain, chest pain, leg pain, syncope spell, back pain and abdominal pain to nausea and bloody stool. He was consistently found to have peripheral neuropathy and on one occasion he was also thought to be suffering narcotic withdrawal. [R. 393]. At his followup appointment at OSU on March 13, 2004, Plaintiff reported feeling better and his DM1 was noted to be under better control. [R. 465]. His Lortab prescription was refilled. *Id.* Two days later he was back at St. John Tulsa Emergency Room complaining of low back pain and nausea and his diabetes was noted to be poorly controlled. [R. 659-663].

On April 9, 2004, Plaintiff requested and received a Lortab refill from Dr. Baugher. [R. 464]. He was reported to be doing much better on April 15, 2004, with continuing diagnoses of DM1, historical poor control, neuropathy and retinopathy. [R. 463]. His Lortab was refilled. *Id.* On April 28, 2004, Plaintiff sought treatment at St. John Sapulpa for leg and groin pain. He was given Phenergan and Demerol. [R. 268-272].

During the month of May 2004, Plaintiff received treatment twice at St. John Tulsa [R. 262-267, 653, 658], twice at OSU [R. 462, 461], three times at TRMC [R. 374-376, 366-373, 357-365] and once at St. John Sapulpa [R. 549-559].  When Plaintiff requested refills from Dr. Baugher on May 27, 2004, this note was written:

> Mr. Moody was seen by me last week.  At that time he had made up a complaint to be worked in so he could ask for a early refill on his lortab.  The next day, Friday 5/21/04 he was seen in the Sapulpa ER for pain complaints. The doctor there, Dr. Wilson, called me to discuss the case. She felt he was a pain med seeker and did not want to give him pain meds.  He had been instructed multiple times by myself to only get narcotics through me but he continues to regularly visit ER's seeking pain medications.  He has multiple documented episodes of non-compliance and was told last week that 1 more episode by him of non-compliance would result in dismissal from this clinic.  I will initiate the process of dismissing him from this clinic.  He called in today asking for a Lortab refill.  He will receive this refill and then be dismissed.

[R. 460].

There is only one report in the record of an emergency room visit by Plaintiff in June 2004. [R. 650-652].

In July 2004, Plaintiff sought treatment twice at St. John Tulsa emergency room [R. 647-649, 642-646] and once at St. Francis [R. 764-770, 1141-1146].  On July 27, 2004, Plaintiff was established as a patient by Henry Speed M.D., at the Family Medical Clinic in Sapulpa with a history of type 1 diabetes, 14 years, poorly controlled, neuropathy 1 1/2 years, no relief with neurontin and gastroparesis, relief with reglan. [R. 513-514].   After examination, Dr. Speed's impression was type 1 diabetes - uncontrolled and diabetic neuropathy. [R. 514].   He noted review of Plaintiff's old records and he prescribed Lortab. *Id.*

13

The record contains a handwritten note on a prescription pad by Dr. Speed which Plaintiff's attorney described as dated April 4, 2004, but which the ALJ described as dated November 4, 2004, stating: "Travis Moody is totally disabled and unable to work." [R. 891-892].

Plaintiff visited St. John Tulsa emergency room once in August 2004 [R. 750-756, 1129-1134] and St. Francis twice [R. 757-763, 1135-1140, 750-756, 1129-1134] complaining of pain in the groin radiating down to the feet and receiving Demerol, Vistoril[22] and Lortab.  After having gotten a refill of Lortab on August 13, 2004 [R. 512], Plaintiff was seen again by Dr. Speed on August 30, 2004. [R. 511].  His blood sugar was "pretty good" but he had burned himself on a heating pad.  Dr. Speed noted back pain and refilled Lortab. [R. 511].

Plaintiff was seen at St. John Tulsa on September 13, 2004, for neuropathy "this pain worse than normal." [R. 635-637].  A urinalysis test was negative for Ketones and he was noted to be due for insulin at home.  He was told to rest, elevate his legs and to see Dr. Speed. *Id.*  On September 17, 2004, Dr. Speed renewed Plaintiff's insulin medications and Lortab. [R. 510].  On September 30, 2004, Dr. Speed noted diarrhea and neuropathy causing more pain in the leg and knee.  [R. 510].

Plaintiff went to the emergency room at St. Francis on October 15, 2004, where he was given Demerol, and to St. John Tulsa on October 18, 2004, where he was given

---

[22]    Vistoril is indicated for symptomatic relief of anxiety and tension associated with psychoneurosis and as an adjunct in organic disease states in which anxiety is manifested. PDR 53rd ed. 2430.

Lortab, before he returned to see Dr. Speed on October 19, 2004. [R. 743-749, 1123-1128; 632-634].  Dr. Speed prescribed more insulin medications and Lortab. [R. 509].

In early November 2004, Plaintiff went to St. Francis [R. 737-742, 1117-1122] to St. John Tulsa [R. 630-631] and to St. John Sapulpa [R. 545-548] seeking a "pain shot" before seeing Dr. Speed on November 15, 2004.  Dr. Speed recorded burning pain in the legs "more intense" due to neuropathy but "diabetes pretty good." [R. 611].  He refilled Plaintiff's Lortab and added Cymbalta[23] and Avinza.[24]   At the November 30, 2004 followup examination, Plaintiff advised the Avinza caused nausea and vomiting but the Cymbalta provided some help. [R. 610].

Except for one trip to the St. Francis emergency room in mid-December 2004, Plaintiff saw only Dr. Speed (four times) during that month. [R. 729-736, 1110-1116].  Dr. Speed reported continuing leg and back pain despite "pretty good" control of diabetes. [R. 606-609].

On January 7, 2005, Subramaniam Krishnamurthi, M.D., examined Plaintiff on behalf of the Social Security Administration. [R. 516-521].  Dr. Krishnamurthi noted Plaintiff's history of diabetes mellitus with neuropathy and his medications. [R. 516].  Physical examination revealed normal motor, sensory, reflexes and range of motion tests but with pain during hip rotation and tenderness and muscle spasm of the lumbosacral spine. [R. 517, 521].  Dr. Krishnamurthi noted that Plaintiff had brought

---

[23]  Cymbalta is used to treat major depression and also used to relieve nerve pain (peripheral neuropathy) in diabetics. See drug information online at: http://www.medicinenet.com/duloxetine-oral/article.htm

[24]  Avinza is a morphine sulfate, slow release long acting capsule. See drug information online at: http://www.fda.gov/MEDwatch/safety/2005/avinza_PI.pdf

crutches to the office but was able to walk without them. [R. 517].  He observed a limp on the right due to back pain as well as right leg pain and reported that Plaintiff's speed was slow due to pain, otherwise steady and stable. [R. 517, 518].

Plaintiff continued to see Dr. Speed approximately every other week through the end of March 2005 [R. 604-605, 600-603, 598-599, 596-597, 592-595, 590] with only one trip to an emergency room; SouthCrest where he was seen March 18, 2005, diagnosed with Ketoacidosis and treated with insulin drip and rehydration fluid. [R. 792-794, 801, 805-813].  He tested positive for opiates and THC and he had a second degree skin burn on the left flank which was attributed to use of a heating pad. [R. 793]. Dr. Speed's records indicate Plaintiff was "doing a little better" on Methadone. [R. 596, 598].

In April 2005, Plaintiff was seen once at St. Francis and once at St. John Sapulpa for bilateral leg pain and back pain caused by peripheral neuropathy and inability to "keep any meds down."  He was transferred to Hillcrest Hospital for overnight treatment on April 28, 2008. [R. 719-728, 1101-1109, 537-544, 538].

Dr. Speed saw Plaintiff again on May 10, 2005, noted his hospital treatment in April, his trouble with his teeth and that his diabetes had been fluctuating. [R. 588-589].

On June 1, 2005, Plaintiff was seen at the SouthCrest emergency room complaining that he hurt his back while lifting a tire and also of pain in his legs due to neuropathy. [R. 830-835].  He was treated with insulin IV and Phenergan and advised to see his primary care physician the next day.  Dr. Speed's June 2, 2005 notations indicate Plaintiff had low back pain the past few days and he renewed Plaintiff's insulin medications as well as Lortab, Cymbalta, Reglan, Neurontin and Methadone. [R. 586-

16

587].  Plaintiff was seen at SouthCrest on June 25, 2005, complaining of leg and back pain. [R. 836-844].  He had a depressed affect and was noted to be taking eight to ten 10mg. Lortab pills a day. [R. 838, 839].  He was advised to followup with Dr. Speed and a pain specialist. [R. 839].  Two days later Plaintiff went to St. John Tulsa, complaining of abdominal pain and diarrhea and pain all over. [R. 623-629].  He advised he was out of pain medication and that he had been unable to see his doctor that day. [R. 624]. After receiving IV insulin, Plaintiff was given Demerol and Phenergan and told to followup with Dr. Speed. *Id.*  Dr. Speed's treatment notes on June 28, 2005, indicate Plaintiff's "blood sugar has been up" but doing "pretty good" on Methadone. [R. 584].

Only one visit to Dr. Speed was recorded in July 2005, at which time Plaintiff reported that his back "locked up" on him and that his legs hurt.  His medications were renewed. [R. 582-583].

On August 16, 2005, Plaintiff's medications were reviewed and renewed by Dr. Speed. [R. 580-581].  On August 23, 2005, he was admitted to SouthCrest for treatment overnight with IV fluids and insulin after being diagnosed with ketoacidosis. [R. 787-791, 800, 814-817].

Dr. Speed reported on September 12, 2005, that Plaintiff's leg and back pain continued but that he was doing better with Methadone and able to exercise some. [R. 578-579].  Plaintiff was treated at SouthCrest on September 22, 2005, for an injury to his right hand and elbow. [R. 845-854].

On October 3, 2005, Plaintiff sought treatment at the SouthCrest emergency room for pain in his legs that felt like they were "on fire" claiming he was out of Lortab. [R. 855-860].  He was given Demerol and Phenergan and told to see Dr. Speed.  He

17

did so that same day. [R. 576].  On October 31, 2005, Dr. Speed noted Plaintiff was hurting "real bad" though his diabetes was "doing pretty good."  Dr. Speed recorded family stress and added Lexapro to Plaintiff's prescribed medications. [R. 574-576].

On November 9, 2005, Plaintiff went to the St. John Sapulpa emergency room complaining of feeling weak, having trouble seeing, whole body tingling and anxiety. [R. 531-536].  Later that same day, he was seen at the St. Francis emergency room complaining of mid-abdominal pain. [R. 1088-1100].  He was noted to be disabled and on Methadone for neuropathy.  After receiving IV fluids and medications, he was discharged home and told to see his primary care physician. [R. 1093].  When he saw Dr. Speed on November 22, 2005, he was noted to be doing "pretty good on Methadone." [R. 572].

Dr. Speed reported Plaintiff had continued leg pain, was exercising some and doing much better on Methadone when he examined him on December 8, 2005. [R. 570-571].  Four days later, Plaintiff went to the emergency room at SouthCrest complaining of right-sided facial pain and swelling for two days. [R. 782-786, 798-799, 802-804, 818-829].  He was found to have cellulitis with abscess, MRSA positive. [R. 782].  He was treated with an antibiotic and, during his seven-day hospitalization, had his blood sugar regulated with insulin. *Id.*  He was discharged in stable condition and instructed to continue his pre-hospital medications as prescribed by his primary care physician. [R. 782-783].  On December 29, 2005, Plaintiff was hospitalized for two days at St. Francis for severe dehydration related to a reaction to the antibiotic prescribed for the MRSA infection. [R. 697-711, 889-890, 1072-1087].

18

Plaintiff was readmitted to St. Francis on January 6, 2006, for diarrhea and increased abdominal cramps. [R. 684-696, 1057-1071]. An esophagogastro-duodenoscopy produced normal results. [R. 693]. Dr. Michael Joseph Martin reported Plaintiff "probably does have intermittent gastroparesis" and that he suspected "that his narcotic use is contributing to his chronic symptomatology also as he is on Methadone and very frequent Lortab." [R. 695]. Dr. Martin recommended continuing Reglan and an acid suppressive agent routinely as well as a gastroparesis diet. [R. 696]. He strongly recommended "weaning him off of all narcotics and trying alternative methods for control of his chronic back pain syndrome" to be done by a pain specialist and suggested to Plaintiff's mother that this be discussed with Dr. Speed. [R. 696]. On January 19, 2006, Plaintiff was admitted directly to St. John Sapulpa by Dr. Speed. [R. 562-565]. The admitting assessment was: Intractable nausea and vomiting; Cholecystitis versus pancreatitis, Diabetes mellitus type 1 uncontrolled, Dehydration. [R. 564]. IV fluids, stool culture and lab work were commenced. *Id.* Dr. Speed reported Plaintiff's urinalysis showed 3+ glucose but that Plaintiff had left the hospital AMA before further studies could be done or further treatment given. [R. 561].

On February 1, 2006, Plaintiff went to the SouthCrest emergency room complaining of vomiting and abdominal pain for five days. [R. 861-873]. He was given pain and nausea medications by IV. *Id.* He returned 13 days later for the same reasons and was given the same treatment. [R. 874-886]. On February 27, 2006, Plaintiff went to St. John Tulsa with a mild burn of the right hand. [R. 617-722]. His hyperglycemia was noted to be stable. *Id.*

19

On March 4, 2006, Plaintiff was hospitalized for two days at St. Francis for nausea, vomiting and diarrhea, though he was found to not be in diabetic ketoacidosis. [R. 674-683, 1046-1056].   He was given Metadone, Lortab and Demerol for breakthrough pain, soma for back spasm, Zofran for nausea and told to followup with his primary care physician within a month. *Id.* On March 11, 2006, he sought treatment at St. John Tulsa emergency room, complaining of chronic severe pain. [R. 612-616]. He reported he had been fired by his primary physician over non-compliance, that he was running out of pain medication and had no followup plan. [R. 613].   He was diagnosed with poorly controlled diabetes, chronic pain syndrome and dental caries and given IV medication.   On March 15, 2006, he was back at St. Francis with acute flare of diabetic gastroparesis and was treated overnight with IV fluids. [R. 666-673, 1038-1045].   J. Damon Smith, D.O., the admitting physician reported:

> The patient is a 23-year-old male who presents with approximately four days of nausea and vomiting, abdominal pain but no fever or diarrhea. He has had several admissions over the past two to three years for these essentially identical complaints.   The patient is a marginally controlled type 1 diabetic with known peripheral neuropathy and gastroparesis.   He typically will have a flare of his gastroparesis and is unable to take his medicines.   His sugars get out of control and his symptoms begin to spiral and today's events are no different.   He is also complaining of some diffuse pain secondary to his inability to keep down any of his pain medications.

[R. 669].   Plaintiff was referred to Dr. Anu Prabhala at Xavier Clinic for tighter control of blood sugars but there is no indication he followed up on this referral.   Plaintiff returned to SouthCrest ten days later with low back and leg pain and was given Methadone, Lortab and insulin medications. [R. 772-781].   The following day, he visited

20

a chiropractor, stating he had been told to see a pain specialist. [R. 893-903].  The day after that, he was seen at the St. Francis emergency room and offered admission but declined. [R. 1029-1037].[25]  The next day, March 27, 2006, he was treated with IV medication in the emergency room at SouthCrest. [R. 887-888].

On April 3, 2006, Dr. Speed filled out and signed a questionnaire form sent to him by Plaintiff's attorney. [R. 665].  He indicated Plaintiff's diagnosis to be type 1 diabetes mellitus with severe neuropathy.  He stated that Plaintiff demonstrated numbness and sensory loss of feet, reflex loss of ankle jerk and pain in legs and feet. To the question: "Are Travis's complaints credible?" Dr. Speed wrote "Yes."  To the question: "Is Travis totally disabled? Why?" Dr. Speed wrote: "Because of pain - has difficulty walking." *Id.*  Before the end of April 2006, Plaintiff was seen at the St. Francis emergency room and at St. John Tulsa and was given Methadone and Lortab as well as insulin treatment. [R. 1022-1028, 910-926].

On May 1, 2006, Plaintiff commenced treatment at Family and Children's Mental Health Services for depression. [R. 932-936, 956-969, 931, 956].  During that month, he was seen at St. Francis, then at St. John Tulsa and finally back at St. Francis on May 21, 2006, was assessed with borderline Ketoacidosis and was kept overnight. [R. 1010-1021, 905-909, 1001-1009].

---

[25]  These records are among those that were not part of the record when the ALJ entered his decision but are dated prior to the date of the ALJ's decision.  They were presented to the Appeals Council and were considered by the Appeals Council in its October 27, 2006 denial. [R. 4, 5-9, 970-971].  This evidence is part of the administrative record and must therefore be considered when evaluating the Commissioner's decision for substantial evidence. *See O'Dell v. Shalala*, 44 F.3d 855, 858- 59 (10th Cir.1994).

From June 22, 2006 through June 23, 2006, Plaintiff was hospitalized at St. Francis for hyperglycemic control and possible withdrawal of narcotic medication. [R. 992-1000].  At discharge he was placed on Lyrica[26] to replace Methadone.  *Id.*  The treatment record ends with Plaintiff's return to St. Francis emergency room on June 29, 2006, for nausea, diarrhea, vomiting, stomach and back pain and neuropathy in legs. [R. 982-881].  He was given IV insulin, Demerol and Ativan.[27]

### The ALJ's Decision

After conducting a hearing on April 24, 2006, the ALJ entered his decision denying benefits on August 18, 2006. [R. 1159-1195, 19-25].  He found Plaintiff to have severe impairments of lumbosacral strain; diabetes mellitus, type 1 with neuropathy; and gastroparesis. [R. 21].  He rejected Plaintiff's claim of vision problems saying: "Although the record reflects that the claimant has been diagnosed with diabetic retinopathy, laser treatment has not been recommended." [R. 21].  He denied the request by Plaintiff's counsel at the hearing for psychological testing to be performed, saying first that Plaintiff was occasionally diagnosed with depression but had not been treated for depression and that such treatment had not been recommended and then stating there is no significant and continuing evidence of a mental impairment.  After

---

[26] Lyrica (pregabalin) is used to relieve neuropathic pain and is also used to treat fibromyalgia and certain types of epileptic seizures. See drug information online at: http://www.nlm.nih.gov/medline plus/druginfo/medmaster/a605045.html

[27] Ativan (Lorazepam) is used to relieve anxiety.  It is also used to treat irritable bowel syndrome, epilepsy, insomnia, and nausea and vomiting from cancer treatment and to control agitation caused by alcohol withdrawal. See drug information online at: http://www.nlm.nih.gov/medline plus/druginfo/medmaster/a682053.html

setting forth his ratings under the four functional areas of the B criteria,[28] he found that Plaintiff's depression is mild and would have only a minimal effect on his ability to perform work related activities. [R. 22].   The ALJ also concluded Plaintiff's alleged problems with his legs and a groin infection were mild and not severe impairments. [R. 21-22].   The ALJ stated he had considered Listings 1.04, disorders of the spine; 9.08, diabetes mellitus; 11.14, peripheral neuropathies; and 5.01, impairments of the digestive system. [R. 22].   In discussing Plaintiff's credibility,  the ALJ pointed to Dr. Krishnamurthi's January 7, 2005 findings of normal sensation to pain and temperature as well as light touch in all four extremities. [R. 23].   Citing the normal x-rays of Plaintiff's spine, the ALJ found no evidence that Plaintiff has a compressed disc. [R. 23]. He then referred to evidence in the record that Plaintiff had been non-compliant in following medical advice and/or recommended treatment and exhibited drug seeking behavior. [R. 23].

The ALJ acknowledged Dr. Speed's statement that Plaintiff is totally disabled and unable to work and his April 3, 2006 questionnaire responses reflecting that Plaintiff is totally disabled because of pain and difficulty walking. [R. 23].   After recognizing that a treating physician's opinion regarding the nature and severity of impairments is entitled to controlling weight, the ALJ stated:

> The evidence of record reflects that the claimant was treated by Dr. Speed during the period July 27, 2004 through February 7, 2006. There is no evidence in the record that the claimant's condition worsened during that period.  It appears

---

[28]  20 C.F.R. § 404.1520a ("B criteria") proscribes a special technique that must be followed in determining the severity of a mental impairment. The mental impairments are evaluated under four broad functional areas in which the degree of functional limitation are rated: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

> that Dr. Speed apparently relied quite heavily on the
> subjective report of symptoms and limitations provided by
> the claimant as there is very little evidence of testing done.
> The Administrative Law Judge accepts the diagnosis of
> diabetes mellitus with neuropathy, but does not give much
> weight to the severity of the limitations that Dr. Speed
> described.

[R. 24] [Exhibit citations omitted].   In addressing Plaintiff's claim of restricted daily

activities, the ALJ said Dr. Speed's progress note of July 27, 2004, reflects Plaintiff's

gastroparesis was relieved with Reglan. [R. 24].   The ALJ concluded Plaintiff could

perform sedentary work activity without experiencing significant exacerbation of his

symptoms. [R. 24].

## Discussion

The ALJ mentioned very little of the medical evidence.  An exhaustive description

of all the medical evidence by the ALJ in his written decision is not required. *See Kepler*

*v. Chater*, 68 F.3d 387, 391 (10th Cir.1995) (formalistic factor-by-factor recitation of the

evidence not required).   However, in an instance such as this where the severity of

Plaintiff's diabetes-related symptoms can be substantiated by the treatment records,

the ALJ's review and consideration of the medical evidence and discussion as to how

that evidence impacted his decision is of critical importance.  The ALJ's written decision

in this regard is inadequate for this Court to determine whether or not substantial

evidence supports his findings. *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir.1996)

(when the ALJ has failed to weigh relevant medical evidence, the court cannot assess

whether relevant evidence adequately supports the ALJ's findings).

With regard to the ALJ's evaluation of the medical evidence that he did discuss

in his decision, Plaintiff complains that the ALJ failed to properly consider the opinion

24

of Dr. Speed and that he failed to consider at all the opinion of another treating physician, Dr. Baugher. [Plaintiff's Opening Brief, Dkt. 16. p. 5].  The Court agrees.

A treating physician may offer an opinion which reflects a judgment about the nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s) and any physical and mental restrictions. See 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  The Commissioner will give controlling weight to that type of opinion if it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record.  §§ 404.1527(d)(2), 416.927(d)(2).  If the ALJ decides that a treating source's opinion is not entitled to controlling weight, he must determine the weight it should be given after considering:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the treating source's opinion is supported by objective evidence; (4) whether the opinion is consistent with the record as a whole; (5) whether or not the treating source is a specialist in the area upon which an opinion is given; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. § 404.1527(d)(2)-(6); *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir.2001).  When an ALJ decides to disregard a medical report by a claimant's physician, he must set forth specific, legitimate reasons for his decision. *See Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. 2003).

Here, the ALJ properly declined to give controlling weight to Dr. Speed's opinion that Plaintiff is unable to work because the ultimate decision of disability is reserved to the Commissioner.  *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1029 (10th

Cir.1994) (A treating physician may opine that a claimant is totally disabled, but "[t]hat opinion is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner].").

However, Dr. Speed's opinion regarding Plaintiff's sensory and reflex losses and his difficulty walking due to pain did warrant consideration and an explanation was required as to the impact such findings had on the ALJ's credibility and RFC findings. *See Watkins*, 350 F.3d at 1300-1301 (resolving the "controlling weight" issue does not end review).  Although the ALJ said he did not give "much weight" to the severity of limitations described by Dr. Speed, he did not specify how much weight this evidence was accorded or how it impacted his assessment of Plaintiff's RFC. *See Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (As part of RFC evaluation process, ALJ must take in account any subjective allegations which can reasonably be accepted as consistent with objective medical evidence); 20 C.F.R. § 404.1529(c)(3); *see also Watkins*, 350 F.3d at 1301; 20 C.F.R. § 404.1527(d) (listing factors to be considered when deciding what weight to be given any medical opinion).

By way of explanation for according Dr. Speed's opinion not much weight, the ALJ offered: 1) the lack of evidence in the record that Plaintiff's "condition worsened" during the treatment period of July 27, 2004 through February 7, 2006; and 2) that Dr. Speed apparently relied quite heavily on Plaintiff's subjective report of symptoms and limitations "as there is very little evidence of testing done." [R. 24].

The ALJ did not explain how he concluded that a worsening condition was required in order for Dr. Speed to determine that Plaintiff had functional limitations after having treated him for a year and a half.  After review of the record, the Court finds no

26

basis for this requirement.  By the time Dr. Speed commenced Plaintiff's treatment in July 2004, Plaintiff had been a frequent patient in emergency rooms and hospitals for complications related to uncontrolled diabetes, including neuropathy, gastroparesis and retinopathy and had been diagnosed and hospitalized with diabetic ketoacidosis at least once. [R. 128-133].  During Dr. Speed's treatment period Plaintiff was hospitalized twice for ketoacidosis. [R. 787-791, 800, 814-817, 792-794, 801, 805-813].   There is no suggestion in Dr. Speed's treatment records that he believed Plaintiff was able to work when he commenced treatment in July 2004 but had since become disabled when he filled out the questionnaire form in April 2006.  The ALJ may not impose his own criteria for forming a medical opinion upon the physician.  *See McGoffin v. Barnhart,* 288 F.3d 1248 (10th Cir. 2002); *Plummer v. Apfel*, 186 F.3d 422, 429 (3rd Cir. 1999) (ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion).  Nor was the ALJ entitled to reject evidence for no reason or for the wrong reason. *See Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)(An ALJ "may not reject [a physician's findings] unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.").

The lack of "testing" that the ALJ concluded undermined Dr. Speed's opinion was also, in this case, not a legitimate basis for disregarding Dr. Speed's opinion regarding Plaintiff's limitations.  Plaintiff was a "direct admit" to St. John Hospital in Sapulpa by Dr. Speed on January 19, 2006. [R. 562-565].   Although the laboratory work up had not been completed by the time Plaintiff left the hospital that day, Dr. Speed's treatment

27

notes indicate he had earlier reviewed Plaintiff's treatment records and was aware of Plaintiff's hospitalization for ketoacidosis in March and August 2005. [R. 514, 788]. The "testing" conducted during those two hospitalizations alone would suffice for purposes of establishing treatment recommendations and for Dr. Speed to reach an opinion regarding Plaintiff's condition. Furthermore, the record contains ample documentation regarding blood tests, urinalysis results, sensory and reflex responses and ambulatory and mobility observations conducted in hospitals and treatment centers, including instances of skin burns caused by Plaintiff's use of heating pads, that tend to support Dr. Speed's findings. The Court finds the reasons set forth in the ALJ's decision for not giving much weight to Dr. Speed's opinion are neither legitimate nor supported by the record.

The ALJ reported Plaintiff's gastroparesis was relieved with Reglan. [R. 23]. The only time this comment appears is in Dr. Speed's initial notes as part of the history given by Plaintiff. [R. 513-514]. Ironically, this is an instance when Dr. Speed "relied upon" Plaintiff's subjective reports and does not reflect Dr. Speed's clinical findings. As the record shows, Plaintiff's gastroparesis flared frequently despite treatment with Reglan and, as noted in the hospital records from January 6, 2006, an acid suppressive agent in conjunction with Reglan was recommended in an attempt to find more effective treatment of Plaintiff's gastroparesis. [R. 696].

The ALJ apparently relied upon Dr. Krishnamurthi's findings of normal sensation to pain, temperature and light touch to undermine Dr. Speed's opinion. [R. 23]. However, despite having earlier mentioned Dr. Krishnamurthi's observation of "a slight limp on the right leg due to pain" [R. 21], the ALJ did not explain how the slow walk,

right-sided limp and findings of pain on range of motion testing found by Dr. Krishnamurthi impacted his analysis of the medical evidence from Plaintiff's treating physicians or of Plaintiff's credibility.  Nor did he explain how he determined Plaintiff could perform the full range of sedentary work,[29] which requires walking occasionally[30] despite these limitations.  The ALJ may not simply pick out portions of a medical report that favor denial of benefits, while ignoring those favorable to disability. *See Hardman v. Barnhart,* 362 F.3d 676, 681 (10th Cir.2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.").

The ALJ did not mention Dr. Baugher's February 19, 2004 Questionnaire responses in which he too opined Plaintiff's impairments prevented substantial gainful work activity. [R. 120].  The ALJ is required to "evaluate every medical opinion" he receives, 20 C.F.R. § 404.1527(d), and to "consider all relevant medical evidence of record in reaching a conclusion as to disability."  *See Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir.2004) (ALJ must evaluate every medical opinion in the record, although weight given to each opinion will vary according to relationship between claimant and medical professional). It is reversible error for the ALJ not to discuss uncontroverted

---

[29]  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

[30]  "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles. Social Security Ruling (SSR) 83-10, 1983 WL 31251, *5.

evidence he chooses not to rely on, as well as significantly probative evidence he rejects. *Grogan*, 399 F.3d at 1266.  This omission requires remand for the ALJ to incorporate his evaluation of Dr. Baugher's opinion into his decision.

The ALJ noted Plaintiff's dismissal from the OSU clinic (where Dr. Baugher practiced) for noncompliance. [R. 23].  Although Dr. Baugher dismissed Plaintiff from his clinic for non-compliance, there is no suggestion that his opinion regarding Plaintiff's inability to perform substantial gainful work activity changed or that improved compliance with his diabetic diet and smoking cessation would restore his ability to work. *See Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985) (in determining whether claimant's failure to undertake treatment precludes recovery of disability benefits four elements must be considered, each of which must be supported by substantial evidence: (1) the treatment at issue should be expected to restore the claimant's ability to work; (2) the treatment must have been prescribed; (3) the treatment must have been refused; (4) the refusal must have been without justifiable excuse); 20 C.F.R. § 404.1530.

The ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were "not entirely credible." [R. 22-23].  However, none of Plaintiff's medical care providers, from emergency room personnel to hospital and clinic physicians, questioned the existence or severity of Plaintiff's pain.  Even those physicians who noted Plaintiff's tendency to abuse narcotics and the need to restrict his access to such drugs, continued to prescribe narcotics or alternative drugs in efforts to treat his pain.  Indeed, the physicians' attempts to refer Plaintiff to pain specialists rather than to rehab or detox is evidence that Plaintiff's pain complaints were perceived

30

to be genuine.  Plaintiff testified that he sometimes could not keep his medications down because of his stomach problems which would then lead to elevation in his blood sugars and commencement of a "vicious cycle." [R. 1174].  This symptom "spiral" was also described in the medical treatment record. [R. 669, 1041].  The ALJ did not reconcile the conflict contained in this evidence and the voluminous medical treatment record with his conclusion that Plaintiff's claims were not credible. The ALJ must discuss uncontroverted medical evidence that he chose not to rely on, as well as significantly probative evidence that was rejected. *Grogan*, 399 F.3d at 1266.

Especially troubling is the following statement by the ALJ:

> The record fails to demonstrate the presence of any pathological clinical signs, significant medical findings, or any neurological abnormalities that would establish the existence of a pattern of pain of such severity as to prevent him from engaging in any work on a sustained basis.

[R. 23].  If by this, the ALJ meant that Plaintiff failed to prove the severity of his pain by objective medical evidence, he was imposing an improper legal standard upon Plaintiff's burden of proof. *See Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987) (Plaintiff need only establish a "loose nexus" between the pain producing impairment and his subjective allegations of pain).  If the ALJ meant there was no medical evidence in the record that Plaintiff suffered severe pain, he was incorrect.  The record reflects that Plaintiff was consistently diagnosed and treated for pain related to peripheral neuropathy and gastroparesis, both of which are complications from diabetes mellitus. A significant number of episodes  were so severe as to require hospitalization at least overnight.  In addition, Plaintiff was diagnosed with diabetic retinopathy no less than five

times and Dr. Baugher noted he was scheduled for laser treatment. [R. 469-470, 120, 466, 455-458, 467].

The medical record also contains several references to Plaintiff's chronic pain as "chronic pain syndrome." [R. 255, 614, 948].  Because the record indicates Plaintiff received treatment at a mental health services clinic prior to the ALJ's decision, Plaintiff's claims of a medically determinable mental impairment must be addressed anew.

The Court remands this case to the Commissioner to reconsider and re-evaluate the entire medical record, including the opinions of Plaintiff's treating physicians, and then to revisit his findings: at step two with regard to Plaintiff's claims of mental impairments; at step three with regard to Plaintiff's claim that he meets or equals Listing 9.08; and at subsequent steps of the evaluative sequence in order to properly determine the credibility of Plaintiff's subjective claims, his RFC and whether he can perform substantial gainful work activity on a continuing basis.  "In determining a claimant's [RFC], the ALJ should first assess the nature and extent of the claimant's physical limitations and then determine the claimant's residual functional capacity for work activity on a regular and continuing basis." *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (internal quotation marks and alterations omitted).  He must "consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less" and a failure to do so "is reversible error." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006).

Accordingly, the decision of the Commissioner finding Plaintiff not disabled is REVERSED and REMANDED to the Commissioner for reconsideration.

Dated this 29th day of April, 2008.

_Frank H. McCarthy_

**FRANK H. McCARTHY**
UNITED STATES MAGISTRATE JUDGE